**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| WILLIAM A. JACOB, | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 24-cv-8649 |
| RIDDELL, INC., | ) ) | |
| Serve Registered Agent: | ) | |
| Corporate Creation Network Inc. | ) | |
| 1320 Tower Road | ) | |
| Schaumburg, IL 60173 | ) ) | |
| Defendant | ) ) | |
|  | ) | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

For his Complaint against Defendant Riddell, Inc., Plaintiff William A. Jacob states and alleges as follows:

### INTRODUCTION

1.     This is a lawsuit for patent infringement involving the Speedflex® and Axiom® football helmets manufactured and sold by Riddell, Inc.

2.     The Speedflex® and Axiom® helmets infringe United States Patent No. 11,464,271 (the "'271 Patent").[1]

---

[1] Though expressly listing the Speedflex® and Axiom® lines of helmets, the instant Complaint is directed towards all infringing products made, used, or sold, currently or in the future, by Defendant, whether currently known or discerned through discovery.

3.     Plaintiff seeks recompense from Riddell for knowingly and intentionally manufacturing and selling these infringing products.   Plaintiff also seeks an injunction to preclude these products from being sold.

## THE PARTIES

4.     Plaintiff William A. Jacob is an individual, residing at 10904 Indiana Avenue, Kansas City, Missouri.  Plaintiff is the assignee of the '271 Patent.

5.     Riddell, Inc. is a corporation organized and existing under the laws of Illinois, having its principal place of business at 9801 W. Higgins Road, Suite 800, Rosemont, IL 60018. Riddell sells the Speedflex® and Axiom® line of helmets in the United States.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) because this action involves a claim for patent infringement.

7.     This Court has personal jurisdiction over Defendant Riddell because Defendant has its principal place of business in this District.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) because Defendant has a regular and established business in this District and has committed acts of infringement in this District.

## FACTUAL BACKGROUND

### *The Idea for the Invention*

9.     On March 16, 1971, William J. Jacob was born to Haitian immigrants, William A. Jacob and Michelle Jacob, in Chicago, Illinois.

10.     William J. quickly excelled in academics and sports, playing baseball, soccer, and football in high school, and Division 1 baseball at Northwestern University.  There, he received a full Type-1 ROTC scholarship, majored in Mechanical engineering, and graduated in 1993.

11.     William J. obtained a Masters in civil/structural engineering in 1997, and in 2001, while working as a professional engineer, obtained a Jurist Doctorate degree from the University of Missouri, Kansas City.

12.     An avid recreational basketball player throughout his life, William J. observed the introduction and proliferation of "break-away" basketball rims that resistively collapse to absorb energy and prevent the backboard glass from shattering upon a dynamic load.

13.     From approximately 2004 until approximately 2011, William J. worked for General Motors as outside patent counsel, where he drafted and prosecuted over 100 patent applications. William J. primarily worked on active material disclosures (e.g., involving shape memory alloy (SMA), shape memory polymer (SMP), etc.), including many disclosures that pertained to energy dissipation (e.g., within the chassis).  This introduced William J. to Austenitic SMA, which requires stress-induced energy to transition from one material state to another, thereby absorbing a quantum of the energy as reflected by the hysteresis loop of the material.

14.     At the same time, the prevalence of Chronic Traumatic Encephalopathy ("CTE"), a degenerative brain disease, was becoming an increasing concern among professional football players.[2]  One study found CTE present in 99% of the NFL players studied.[3]  A group of former players sued the NFL over head injuries, claiming the league didn't do enough to protect them.[4] This ultimately resulted in a $765 million dollar settlement.  The NFL responded with initiatives

---

[2] https://www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/timeline-the-nfls-concussion-crisis/
[3] https://www.bu.edu/articles/2017/cte-former-nfl-players/
[4] https://www.cnn.com/2011/12/22/us/sport-nfl-concussion-lawsuits/index.html

such as the NFL Helmet challenge, which encouraged innovators to come up with new and safer helmets.[5]

15.     During the 2011 season, William J. was watching an NFL broadcast when he observed a receiver jump to catch a touchdown pass in the endzone.  The receiver was undercut by a defender, which caused the receiver to become inverted in the air.  Having caught the ball, the receiver was unable to use his hands to control his fall.  His helmet struck the turf, causing him to lay motionless on the field.  After several minutes, he was able to rise, but was diagnosed with a concussion and did not return to the game.

16.     Watching this play unfold gave William J. the idea for a football helmet that was disparately configured to dissipate or absorb energy in the dorsal portion of the shell, while maintaining its deflective capability on the sides.  William J. began diligently working on several embodiments of this idea.

17.     On March 17, 2012, William J. filed U.S. provisional patent application No. 61/612,249, including FIGS. 1 through 10; and on May 14, 2012, he filed U.S. provisional patent application No. 61/646,596, including the same FIGS. 1 through 10, with the United States Patent and Trademark Office.

### The Disclosure to Riddell

18.     In the spring of 2012, William J. spoke by phone with Chris Kays ("Kays"), the Director of Product Marketing and Management at Riddell, about his invention and provisional patent application, in effort to offer Riddell an exclusive license or purchase and enter confidential negotiations.   Kays seemed genuinely interested and asked for more information.

---

[5] https://www.nfl.com/playerhealthandsafety/equipment-and-innovation/innovation-challenges/nfl-helmet-challenge

19.     William J. subsequently emailed Kays and others the provisional patent application

and inquired about a possible licensing arrangement:

> *From: William Jacob [mailto:wjj@jacobllc.com]*
> *Sent: Wednesday, May 30, 2012 2:41 PM*
> *To: ckays@riddellsports.com; Rob Ball; sreynolds@xenith.com;*
> *mklein@rawlings.com*
> *Subject: Energy absorbing/dissipating helmet*
>
> *Greetings Gentlemen:*
>
> *I want to present to each of your respective companies my concepts for improving the performance of protective helmets in a wide range of applications, and most notably football.  Please have a look at my inventions summarized by the attached patent application already filed. As you can see, the application is strongly supported and the claims provide broad protection.  For a quick summary of the two main concepts*
> *see Claims 1 and 21.*
>
> *If you have any interest or questions, please hesitate to contact me (preferably via email).  I will consider any offer for an exclusive license or purchase, and will hold all communications in confidence (though I will alert the others to the fact that an offer has been made without disclosing what the offer is, in case someone wants to make a*
> *counter offer).*
>
> *Thank you for your time and any consideration in advance.*
>
> *Sincerest regards,*
>
> *William J. Jacob*
> *Jacob & Associates, LLC*
> *324 E. 11th Street, Suite 101*
> *Kansas City, MO 64106*
> *(816) 204-6430*
> *Fax: (816) 221-2575*
> *Email: wjj@jacobllc.com*

20.     William J. followed up by sending Kays the drawings that accompanied the

application:

> *From: William Jacob [mailto:wjj@jacobllc.com]*
> *Sent: Friday, June 1, 2012 11:06 AM*

5

*To: ckays@riddellsports.com; Rob Ball; sreynolds@xenith.com; mklein@rawlings.com*

*Subject: Energy absorbing/dissipating helmet*

*Guys, please find attached the drawings that go with the application. I apologize for the oversight.*

*Sincerely,*

*William*

21.     No further communications were sent to or received from Defendant.

22.     On March 16, 2013, the AIA became effective, changing the United States to a first-to-file jurisdiction.[6]

23.     On May 14, 2013, William J. filed U.S. non-provisional application, U.S. Ser. No. 13/894423 (the "'423 application), claiming priority to the '596 provisional application.

24.     The '423 application became the '271 Patent (**Exhibit 1**), which is attached to this Complaint and incorporated by reference as if fully set forth herein.

25.     The '271 Patent was assigned to Plaintiff.

### *Riddell Introduces Speedflex® and Axiom®*

26.     In 2014, Riddell began selling its Speedflex® line of helmets in the United States, for a variety of age groups, both amateur and professional.

27.     The Speedflex® features an energy dissipating section in the dorsal portion and front elevation of the shell and non-active sections in the sides.

28.     Riddell sells various iterations of the Speedflex®, including the Speedflex Diamond® and Precision Fit®.

---

[6] https://www.uspto.gov/web/offices/pac/mpep/s2159.html

29.    The Speedflex® achieved immediate commercial success, and fast became one of the most popular and widely utilized football helmets in the United States.

30.    William J. took note of the Speedflex® helmet and, on or about June 28, 2016, caused his attorney to send Riddell a cease-and-desist letter (**Exhibit 2**).  The letter included a claim chart comparing the configuration of the Speedflex® to the claims of the '423 application, which are substantially similar to the issued claims of the '271 Patent.

31.    Riddell responded to the cease-and-desist letter by telling William J. to resume communication "when you get a patent."  Meanwhile, it continued to manufacture and sell infringing products.

32.    In 2021, Riddell introduced its Axiom® line of helmets to the United States.

33.    The Axiom® features multiple energy dissipating sections in the dorsal portion, which can be viewed in the front and back elevations of the shell.

34.    Upon information and belief, Defendant has sold over 100,000 Speedflex® helmets, over 1000 Axiom® helmets, and has earned over $50 Million in annual revenue from the sale and servicing of the infringing helmets in the United States to date.

35.    The success of the Speedflex® and Axiom® helmets is due, in part, to the groundbreaking innovations that are disclosed and claimed in the '271 Patent, and that were shared with Riddell back in 2012.

36.    The '271 Patent claims the genus to which the Speedflex® and Axiom® helmets belong, and in summary, a football helmet comprising at least one energy dissipating section in the dorsal portion and front elevation, and non-active sections in the side portions, wherein the dissipating section(s) and non-active sections are cooperatively conjured such that the dissipating

section absorbs a greater portion of energy resulting from an anticipatory impact than does the non-active sections of the shell itself, by resistively collapsing towards the head of the user.

37.     Riddell has enjoyed a substantial financial windfall from its use of Plaintiff's patented technologies.  Riddell's statements and behavior make it clear that it intends to continue to reap profits from its use of Plaintiff's patented technology in 2024 and beyond, including by making products in the United States to serve the global market.  For example, it is noted that American Football has begun to be played in other countries such as Germany.  Riddell actively promotes its Speedflex® and Axiom® helmets, including through its website: www.riddell.com.

## COUNT I – INFRINGEMENT OF THE '271 PATENT - SPEEDFLEX®

38.     Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

39.     Defendant has directly infringed and continues to directly infringe one or more of the claims of the '271 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing the Speedflex® helmets in the United States and in this District without authority, in violation of 35 U.S.C. § 271(a).

40.     The use of the Speedflex® helmets in accordance with their adopted packaging and/or instructions infringe one or more of the claims of the '271 patent. Defendant has induced infringement and continues to induce infringement of one or more of the claims of the '271 Patent, either literally or under the doctrine of equivalents, by encouraging others, including but not limited to football leagues, teams, and players on various scholastic and professional levels, to make and/or use the Speedflex® helmets in the United States and in this District in a manner that would directly infringe the '271 Patent. Defendants have intentionally encouraged and will continue to intentionally encourage acts of direct infringement by others, including but not

limited to football leagues, teams, and players, with knowledge of the '271 Patent and with knowledge that their acts are encouraging infringement, in violation of 35 U.S.C. § 271(b).

41.     Speedflex® helmets' designs constitute a material part of the invention of one or more claims of the '271 Patent and are not a staple article or commodity of commerce suitable for substantial noninfringing use. Defendant has contributorily infringed and continues to contributorily infringe one or more of the claims of the '271 Patent, either literally or under the doctrine of equivalents, by promoting the making and use of the Speedflex® helmets in accordance with its adopted packaging and/or instructions in the United States and in this District by others, including but not limited to football leagues, teams, and players, and knowing that the Speedflex® helmets are especially made or especially adapted for use to infringe the '271 Patent, in violation of 35 U.S.C. § 271(c).

42.     Defendant has infringed or will infringe one or more of the claims to the '271 Patent, either literally or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(f), including by supplying the global market for the Speedflex® helmets with components manufactured in the United States.

43.     The Speedflex® helmets satisfy each and every element of at least **Claims 1-4, 6, 9, 10, and 15** of the '271 Patent.

44.     For example, Claim 1 of the '271 Patent is representative and recites:

A protective football helmet configured to fit upon the head of a user, to receive an anticipatory impact having energy on a predefined area of the helmet, and to dissipate a portion of the energy, so as to not transfer said portion of the energy to the user, when the helmet is donned and the impact is received on said predefined area, said football helmet comprising:

> an outer shell of hard plastic defining a continuous exterior surface adapted to receive the anticipatory impact when the helmet is donned, presenting a front elevation, and including a left side portion, a right side portion, and a dorsal portion defining a crown, wherein the left side portion, the dorsal portion, and the right side portion are viewable

in the front elevation, and cooperatively define the continuous exterior surface, and wherein the dorsal portion is intermediate the left side portion and the right side portion,

said shell defining a rigid, non-active section in each of said left side portion and right side portion, wherein the non-active section is operable to provide structural integrity to the helmet, when receiving the anticipatory impact,

said shell further defining at least one compliant energy dissipating section disposed within the front elevation and the dorsal portion, said at least one compliant energy dissipating section has a length and a width, the length extending along the dorsal portion between the front and back portion of the helmet, and said at least one compliant energy dissipating section configured to be deformed by the anticipatory impact, so as to dissipate at least a portion of the energy when receiving the anticipatory impact, wherein said at least one compliant energy dissipating section is configured to resistively collapse towards the head of the user when receiving the anticipatory impact,

said at least one compliant energy dissipating section and non-active section being cooperatively configured, such that said at least one compliant energy dissipating section undergoes a greater amount of deformation than does the non-active section when each section receives the anticipatory impact, and said at least one compliant energy dissipating section dissipates said portion of the energy and achieves an impact condition, when receiving the anticipatory impact, and said non-active section does not dissipate said portion of the energy and does not achieve the impact condition, when receiving the anticipatory impact;

interior padding adapted to engage the head of the user when the helmet is donned, and configured to be compressed when the shell receives the anticipatory impact; and

a facemask.

45.     The Speedflex® helmets are each a protective football helmet configured to fit upon the head of a user, to receive an anticipatory impact having energy on a predefined area of the helmet, and to dissipate a portion of the energy, so as to not transfer said portion of the energy to the user, when the helmet is donned and the impact is received on said predefined area.

46.     The Speedflex® helmets each comprise an outer shell of hard plastic defining a continuous exterior surface adapted to receive the anticipatory impact when the helmet is donned.

47.     The Speedflex® helmets each present a front elevation, and include a left side portion, a right-side portion, and a dorsal portion defining a crown, wherein the left side portion, the dorsal portion, and the right side portion are viewable in the front elevation, and cooperatively define the continuous exterior surface.

48.     The dorsal portion is intermediate the left side portion and the right-side portion. The shell defines a rigid, non-active section in each of said left side portion and right-side portion, wherein the non-active section is operable to provide structural integrity to the helmet, when receiving the anticipatory impact.

49.     The shell further defines at least one compliant energy dissipating section disposed within the front elevation and the dorsal portion.

50.     At least one compliant energy dissipating section has a length and a width, the length extending along the dorsal portion between the front and back portion of the helmet.

51.     At least one compliant energy dissipating section is configured to be deformed by the anticipatory impact, so as to dissipate at least a portion of the energy when receiving the anticipatory impact, wherein said at least one compliant energy dissipating section is configured to resistively collapse towards the head of the user when receiving the anticipatory impact.

52.     At least one compliant energy dissipating section and non-active section are cooperatively configured, such that the at least one compliant energy dissipating section undergoes a greater amount of deformation than does the non-active section when each section receives the anticipatory impact.

53.     At least one compliant energy dissipating section dissipates said portion of the energy and achieves an impact condition, when receiving the anticipatory impact; and the non-

11

active section does not dissipate said portion of the energy and does not achieve the impact condition, when receiving the anticipatory impact.

54.    The Speedflex® helmets further comprise interior padding, adapted to engage the head of the user when the helmet is donned and configured to be compressed when the shell receives the anticipatory impact, and a facemask.

55.    The main feature of the Speedflex® is force attenuation or energy absorption through deformation of the shell itself. At ¶ [0037] of its '644 Patent Publication, for example, Riddell admits that "the impact attenuation system 14 is specifically designed and engineered to adjust how the helmet 10 responds to impact forces occurring while playing football and manages the energy resulting from those impacts."

56.    Riddell's own website confirms that the "Flex system flexibility engineered into the helmet's shell . . . reduces impact force transfer to the athlete." *See* https:\www.riddell.com.

57.    An ESPN article on the Speedflex® further described its impact attenuation: "As you can see in those tweets, the Speedflex's defining visual feature is a cutout on the crown, which creates a flexible panel designed to disperse the force of an impact. How flexible is it? Judging from a sample helmet that Riddell provided at Uni Watch's request, the panel definitely has some give -- if you push on it, it bends a bit, as you can see in this short but illustrative Uni Watch video." *See* https://www.espn.com/ college-football/story/_/id/10786582/uni-watch-speedflex-introduces-new-technology-help-alleviate-impact.

58.    And finally, an ABC News article on the Speedflex quotes a Riddell spokesperson as follows:

> "the flexible portion of the shell, when it works in conjunction with the padding on the inside of the shell can actually reduce forces more than if the shell was solid," Thad Ide, Riddell's senior vice president of research and product development, told

ABC News. "Allowing the helmet to flex during impact could also reduce forces from frontal impact to the players head."

*See* https://abcnews.go.com/US/riddell-unveils-football-helmet-speedflex/story?id =25141779.

59. The Speedflex® is described and depicted in Defendant's disclosures, and the graphs, drawings, and pictorial representations shown in the slides[7] attached to the Cease-and-Desist letter **(Exhibit 2)**.

60. As per Claim 2, and as shown in the slides, the Speedflex® includes an energy dissipating section (its flexible panel) that is *laterally centered within the dorsal portion*.

61. As per Claim 3, and as shown in the slides, the Speedflex® includes a shell *formed of an injected molded hard plastic*.

62. As per Claim 4, and as shown in the slides, the Speedflex® shell *defines an inverted U-shaped opening* configured to receive a facemask, *in the front elevation*. The dorsal portion cooperatively defines the U-shape's cross edge, but not the vertical edges, which limits the dorsal portion's width. The Speedflex's dissipating section is spaced from the opening.

63. As per Claim 5, and as shown in the slides, the at least one flexible panel in the Speedflex® is defined by *a through-hole*. As defined by the '271 Patent, the term "through-holes" means "one or more through-hole."[8] The Speedflex®'s through-hole is configured such that the flexible panel resistively collapses towards the head of the user when receiving the anticipatory impact.

64. As per Claim 6, and as shown in the slides, the Speedflex's shell presents a unitary and non-module structure.

---

[7] The attached slides (1 thru 47) are adopted and incorporated by reference as if fully stated herein.
[8] *See* col 11, ln 65 – col 12, ln 1: "The suffix '(s)' as used herein is intended to include both the singular and the plural of the term that it modifies, thereby including one or more of that term."

65.     As per Claim 9, and as shown in the slides, the Speedflex's shell and padding are cooperatively configured such that the padding achieves a thinner collapsed profile adjacent the flexible panel than it does adjacent the non-active sections.

66.     As per Claim 10, and as shown in the slides, the Speedflex's impact attenuation system is presented by at least one of a geometric configuration, a thin layer of hard plastic, or *at least one fold* operable to cause the flexible panel to resistively collapse towards the head of the user, when the panel receives the anticipatory impact.

67.     As per Claim 15, and as shown in the slides, the Speedflex® presents a protective football helmet comprising an outer shell of durable material and presenting opposite *front and back elevations*.  The Speedflex satisfies all of the limitations of  combination Claim 15 as stated above.

68.     The Speedflex® provisionally infringed the pending claims of the published application as conveyed to Defendant on July 28, 2016.  *See* Cease-and-Desist letter (**Exhibit 2**), comparing the Speedflex® to the pending claim limitations that were substantially similar to the eventual claim limitations of the '271 Patent.

69.      Defendant promotes the use of the Speedflex® to infringe one or more claims of the '271 Patent.  For example, Defendant's publication and website instruct athletes and coaches how to use the helmet.

70.     Defendant had knowledge of the '271 Patent and knowledge that their actions promoting the use of the Speedflex® in the United States induces infringement and contributorily infringes the '271 Patent.

71.     Defendant's infringement of the '271 Patent has been willful.  As discussed above, Riddell chose to bring the Speedflex® to market, and thus, became an industry standard

in protective football helmets, knowing that it utilized the same dual shell configuration and functionality as Plaintiff's patent protected invention. Riddell has continued to use the invention claimed in the '271 Patent in deliberate disregard for Jacob's patent rights.

72. Plaintiff has sustained damages as a direct and proximate result of Defendant's infringement of the '271 Patent. Plaintiff is entitled to an award of compensatory damages, including reasonable royalties, for Defendant's infringement of the '271 Patent.

73. Defendant has engaged in egregious infringement behavior with respect to the '271 Patent warranting an award of enhanced damages under 35 U.S.C. § 284.

74. Defendant's conduct with respect to the '271 Patent makes this case stand out from others and warrants an award of attorneys' fees under 35 U.S.C. § 285.

## COUNT II – INFRINGEMENT OF THE '271 PATENT - AXIOM®

75. Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

76. Defendant has directly infringed and continue to directly infringe one or more of the claims of the '271 Patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing the Axiom® helmet in the United States and in this District without authority, in violation of 35 U.S.C. § 271(a).

77. Use of the Axiom® helmet in accordance with their adopted packaging and/or instructions infringe one or more of the claims of the '271 patent. Defendant has induced infringement and continues to induce infringement of one or more of the claims of the '271 patent, either literally or under the doctrine of equivalents, by encouraging others, including but not limited to football leagues, teams, and players on various scholastic and professional levels, to make and use the Axiom® helmets in the United States and in this District in a manner that would directly infringe the '271 patent. Defendant has intentionally encouraged and will

continue to intentionally encourage acts of direct infringement by others, including but not limited to football leagues, teams, and players, with knowledge of the '271 Patent and with knowledge that their acts are encouraging infringement, in violation of 35 U.S.C. § 271(b).

78.     The Axiom® helmet's design constitutes a material part of the invention of one or more claims of the '271 patent and is not a staple article or commodity of commerce suitable for substantial noninfringing use. Defendant has contributorily infringed and continues to contributorily infringe one or more of the claims of the '271 patent, either literally or under the doctrine of equivalents, by promoting the making and use of the Axiom® helmet in accordance with its adopted packaging and/or instructions in the United States and in this District by others, including but not limited to football leagues, teams, and players, and knowing that the Axiom® helmet is especially made or especially adapted for use to infringe the '271 patent, in violation of 35 U.S.C. § 271(c).

79.     Defendant has infringed or will infringe one or more of the claims to the '271 Patent, either literally or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(f), including by supplying the global market for the Axiom® helmet with components manufactured in the United States.

80.     The Axiom® helmet satisfies each and every element of one or more claims of at least **Claims 1-6, 8, 9, 10, 12, and 15** of the '271 Patent.

81.     For example, Claim 1 of the '271 Patent is representative and recites:

A protective football helmet configured to fit upon the head of a user, to receive an anticipatory impact having energy on a predefined area of the helmet, and to dissipate a portion of the energy, so as to not transfer said portion of the energy to the user, when the helmet is donned and the impact is received on said predefined area, said football helmet comprising:

an outer shell of hard plastic defining a continuous exterior surface adapted to receive the anticipatory impact when the helmet is donned, presenting a front elevation, and including a left side portion, a right side portion, and a dorsal portion defining a crown,

16

wherein the left side portion, the dorsal portion, and the right side portion are viewable in the front elevation, and cooperatively define the continuous exterior surface, and wherein the dorsal portion is intermediate the left side portion and the right side portion,

said shell defining a rigid, non-active section in each of said left side portion and right side portion, wherein the non-active section is operable to provide structural integrity to the helmet, when receiving the anticipatory impact,

said shell further defining at least one compliant energy dissipating section disposed within the front elevation and the dorsal portion, said at least one compliant energy dissipating section has a length and a width, the length extending along the dorsal portion between the front and back portion of the helmet, and said at least one compliant energy dissipating section configured to be deformed by the anticipatory impact, so as to dissipate at least a portion of the energy when receiving the anticipatory impact, wherein said at least one compliant energy dissipating section is configured to resistively collapse towards the head of the user when receiving the anticipatory impact,

said at least one compliant energy dissipating section and non-active section being cooperatively configured, such that said at least one compliant energy dissipating section undergoes a greater amount of deformation than does the non-active section when each section receives the anticipatory impact, and said at least one compliant energy dissipating section dissipates said portion of the energy and achieves an impact condition, when receiving the anticipatory impact, and said non-active section does not dissipate said portion of the energy and does not achieve the impact condition, when receiving the anticipatory impact;

interior padding adapted to engage the head of the user when the helmet is donned, and configured to be compressed when the shell receives the anticipatory impact; and

a facemask.

82.     As per Claim 1, the Axiom® helmet is a protective football helmet configured to fit upon the head of a user, to receive an anticipatory impact having energy on a predefined area of the helmet, and to dissipate a portion of the energy, so as to not transfer said portion of the energy to the user, when the helmet is donned and the impact is received on said predefined area.

83.     The Axiom® helmet comprises an outer shell of hard plastic defining a continuous exterior surface adapted to receive the anticipatory impact when the helmet is donned.

17

84.     The Axiom® helmet presents a front elevation, and include a left side portion, a right side portion, and a dorsal portion defining a crown, wherein the left side portion, the dorsal portion, and the right side portion are viewable in the front elevation, and cooperatively define the continuous exterior surface.

85.     The dorsal portion is intermediate the left side portion and the right side portion.

86.     The shell defines a rigid, non-active section in each of said left side portion and right side portion, wherein the non-active section is operable to provide structural integrity to the helmet, when receiving the anticipatory impact.

87.     The shell further defines at least one compliant energy dissipating section disposed within the front elevation and the dorsal portion.

88.     At least one compliant energy dissipating section has a length and a width, the length extending along the dorsal portion between the front and back portion of the helmet.

89.     At least one compliant energy dissipating section configured to be deformed by the anticipatory impact, so as to dissipate at least a portion of the energy when receiving the anticipatory impact, wherein said at least one compliant energy dissipating section is configured to resistively collapse towards the head of the user when receiving the anticipatory impact.

90.     At least one compliant energy dissipating section and non-active section are cooperatively configured, such that the at least one compliant energy dissipating section undergoes a greater amount of deformation than does the non-active section when each section receives the anticipatory impact.

91.     At least one compliant energy dissipating section dissipates said portion of the energy and achieves an impact condition, when receiving the anticipatory impact; and the non-

active section does not dissipate said portion of the energy and does not achieve the impact condition, when receiving the anticipatory impact.

92.     The Axiom® helmet further comprises interior padding, adapted to engage the head of the user when the helmet is donned and configured to be compressed when the shell receives the anticipatory impact, and a facemask.

93.     Similar to the Speedflex®, the Axiom® features force attenuation or energy absorption through deformation of the shell itself and includes *at least one* energy dissipation section.

94.     The Axiom® differs from the Speedflex®, at least, by incorporating multiple flexible panels into its shell.  More particularly, a first flexible panel is laterally centered and disposed in the front elevation, a second flexible panel is disposed in the dorsal portion left of crown, a third flexible portion is disposed in the dorsal portion right of crown, and a fourth flexible panel is laterally centered and disposed in the back elevation (*see,* picture (1) below).

 (1)

https://content.riddell.com/axiom-faq/

95.     As per Claim 2 of the '271 Patent, and as shown in picture (1), the Axiom® includes at least one energy dissipating section (flexible panel) that is *laterally centered within the dorsal portion*.

96.     As per Claim 3, and as shown in picture (1), the Axiom® includes a shell *formed of an injected molded hard plastic*.

19

97.     As per Claim 4, and as shown in picture (1), the Axiom® shell *defines an inverted U-shaped opening* configured to receive a facemask, in the front elevation.  The dorsal portion cooperatively defines the U-shape's cross edge, but not the vertical edges, which limits the dorsal portion's width.  The Axiom®'s dissipating section is spaced from the opening.

98.     As per Claim 5, and as shown in picture (1), the four flexible panels in the Axiom® are defined by *through-holes*.   Each through-hole is configured such that the respective flexible panel resistively collapses towards the head of the user when receiving an anticipatory impact.

99.     As per Claim 6, and as shown in picture (1), the Axiom®'s shell presents a unitary and non-module structure.

100.     As per Claim 9, and as shown in picture (1), the Axiom®'s shell and padding are cooperatively configured such that the padding achieves a thinner collapsed profile adjacent the flexible panel than it does adjacent the non-active sections.

101.     As per Claim 10, and as shown in picture (1), the Axiom®'s impact attenuation system is presented by at least one of a geometric configuration, a thin layer of hard plastic, or *at least one fold* operable to cause the respective flexible panel to resistively collapse towards the head of the user, when the panel receives an anticipatory impact.

102.     As per Claim 12, and as shown in picture (1), the Axiom® includes a shell that presents opposite front and back elevations, and the energy dissipating sections are *viewable in the front and back elevations*.

103.     As per Claim 15, and as shown in picture (1), the Axiom® satisfies the limitations of combination Claim 15 of the '271 Patent for the reasons stated above.

104. Defendant promotes the use of the Axiom® to infringe one or more claims of the '271 Patent. For example, Defendant publication and website instruct athletes and coaches how to use the Axiom® helmet.

105. Defendant has knowledge of the '271 Patent and knowledge that their actions promoting the use of the Axiom® in the United States induces infringement and contributorily infringes the '271 Patent.

106. Defendant's infringement of the '271 Patent has been and continues to be willful. As discussed above, Riddell chose to bring the Axiom® to market, knowing that it utilizes the same dual shell configuration and functionality as Plaintiff's patent-protected invention. Riddell has continued to use the invention claimed in the '271 Patent in deliberate disregard for Plaintiff's patent rights.

107. Plaintiff has sustained damages as a direct and proximate result of Defendant's infringement of the '271 Patent with respect to the Axiom® helmet.

108. Plaintiff is entitled to an award of compensatory damages, including reasonable royalties, for Defendant's infringement of the '271 Patent, under 35 U.S.C. § 284.

109. Defendant has engaged in egregious infringement behavior with respect to the '271 Patent warranting an award of enhanced damages, under 35 U.S.C. § 284.

110. Defendant's conduct with respect to the '271 Patent makes this case stand out from others and warrants an award of attorneys' fees, under 35 U.S.C. § 285.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court grant the following relief:

A.     A judgment that Defendant has infringed one or more claims of the '271 Patent, induced infringement of one or more claims of the '271 Patent, and/or contributorily infringed one or more claims of the '271 Patent;

B.     A judgment that Defendant's infringement was and is willful;

C.     An award to Plaintiff of monetary damages for

1)     Defendant's provisional infringement of the '271 Patent, including reasonable royalties occurring on or after June 28, 2016, the date that Defendant had actual notice of the *pending* claims of the November 14, 2013 publication, which were substantially similar to the issued claims of the '271 Patent;[9] and

2)     Defendant's infringement of the '271 Patent, including reasonable royalties occurring on or after October 11, 2022, together with interest, costs, expenses, disbursements, and an accounting to determine same;

D.     An award to Plaintiff of all other damages permitted by 35 U.S.C. § 284, including enhanced damages for willful infringement, up to three times the amount of monetary damages found in C.(1) and (2);

E.     A declaration that this is an exceptional case and an award to Plaintiff of his attorney's fees, costs, and expenses, pursuant to 35 U.S.C. § 285; and

---

[9] *Classen Immunotherapies, Inc. v. King Pharmaceuticals, Inc.*, Civil No. WDQ-04-3521, 12 (D. Md. Dec. 6, 2005) ("What constitutes "actual notice" is unclear under § 154(d)(1)(B) and the case law. In one of the few cases construing § 154(d)(1)(B), the Federal Circuit in *Stephens v. Tech International* held that a patentee had provided "section 154 notice" when the patentee sent the defendant a letter claiming that one of the defendant's products infringed several claims of the patentee's pending patent application. 393 F.3d 1269, 1275 (Fed Cir. 2004). The *Stephens* court held that, "the letter represented [the plaintiff's] adherence to section 154's requirement that [the defendant] be placed on notice of Spectrum's future right to obtain royalties if a patent issued." *Id.* at 1276.")

F.  Such other relief as this Court may deem just and proper except Plaintiff does not currently seek an injunction as he desires that football players continues to have access to safer helmet technology.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury on all issues so triable in accordance with Rule 38 of the Federal Rules of Civil Procedure.

Date: September 19, 2024                    Respectfully Submitted,


/s/_____

Allen Justin Poplin, NDIL 21598
James Kernell
     (*pro hac vice* application forthcoming*)*
**AVEK IP, LLC**
7285 W. 132nd Street, Suite 340
Overland Park, KS 66213
Phone: 913-549-4700
Fax: 913-549-4646
jpoplin@avekip.com
jkernell@avekip.com


David L. Marcus
     (*pro hac vice* application forthcoming*)*
**DLM LAW LLC**
4700 Belleview Ave., Suite 200
Kansas City, MO 64112
Telephone: 816-268-6775
Fax: 816-222-0534
dmarcus@bmlawkc.com